WILLIAM T. CARSTARPHEN, petitioner-respondent,

*v.*

ANNE TERESA CARSTARPHEN, defendant-appellant.

[Submitted February 12th, 1937.   Decided April 30th, 1937.]

*Mr. Edward Sachar* and *Mr. John Winans,* for the petitioner-respondent.

*Messrs. Collins & Corbin, Mr. Edward A. Markley* and *Mr. John F. Leonard,* for the defendant-appellant.

The opinion of the court was delivered by

DONGES, J.

This is an appeal from a decree *nisi* awarding the petitioner husband a divorce on the ground of desertion and dismissing the defendant wife's counter-claim for maintenance.

The parties were married in 1901 and went to Plainfield to live in 1919.   Three children were born of the marriage, a daughter thirty-three years of age, a daughter twenty-nine years of age, and a son twenty-five years of age at the time of the hearing in March, 1936.   Petitioner is a physician and until recently practiced in Plainfield.

The husband and wife seem to have lived in a fairly harmonious state until about the year 1922, when the wife became suspicious of her husband's relations with a woman in New York City.   She accused him, and the evidence on her behalf,

from herself and one daughter, is that petitioner admitted keeping company with this woman. From this time there was discord arising apparently largely out of these suspicions of the wife. Another source of trouble was the matter of the discipline of the children, the defendant objecting to smoking, drinking and late hours on the part of her daughters and son, and the husband taking a more complacent attitude.

Things seem to have reached somewhat of a climax in the spring of 1927 when there occurred an altercation between the petitioner and the younger daughter on the one side, and the defendant on the other. According to the defendant, the trouble started when the daughter arose for the day at five-thirty P. M. At dinner an argument occurred which continued later, and resulted in the defendant's threatening to leave. She did go out of the house, and after walking around the town purchased two bottles of veronal at a drug store. She returned to the house and was ridiculed by her daughter and husband for not having made good her threat to leave. She then threatened to commit suicide and was told by the petitioner that she did not have "the guts to do it." Whereupon, she drank the two bottles of veronal. She lost consciousness, or at least all memory of what was occurring, and regained consciousness several days later in a private sanatorium at Belle Meade where her husband and daughter had taken her, after she had been around the house in a dazed condition for two days as a result of taking the overdose of sedative. She was confined in this institution against her will, she says, for several weeks until she succeeded in smuggling out a letter to her lawyer who threatened court proceedings and obtained her immediate release. While in this place she wrote her husband two letters, D-10 under date of April 21st, 1927, and D-11 under date of April 23d, 1927, which were moving appeals for rescue from the obnoxious situation in which he had placed her. The institution was one for mental defectives, drug addicts and alcoholics, a most trying place for one in normal mental condition, which defendant admittedly was, to stay. But the appeals brought no response from the husband and she was left to her own resources to get out. He visited her once, she says.

In October, 1927, after further disturbing occurrences, Mrs. Carstarphen left and went to live and work in New York. According to the husband, their younger daughter and son, several efforts were made to effect a reunion of the family, but the best offer the defendant would make was to come back provided petitioner would admit in writing his misconduct with women, which he refused to do.

On the part of the wife there is a flat denial of any *bona fide* effort on petitioner's part to get the family together again. She is supported by the elder daughter who testified that as far as she could observe her father was at all times anxious and willing to be rid of her mother.

The advisory master found for the husband and, although he says the parties are both people of culture and refinement, he lays great stress upon the allegation that defendant falsely accused the petitioner of improper relations with women, and further upon a finding that the defendant was obstinate and willful in attempting to impose her standards of conduct upon her children. Of course, a great deal in this case depends upon credibility, and it is usually said that the trier of the facts is in better position to judge credibility than an appellate court. But one cannot study the testimony without being persuaded that the evidence compels a conclusion contrary to that reached by the court below. The testimony on behalf of the defendant is as believable as that of petitioner, if not more so; and there are certain events which stand out and cannot be denied, which seem indisputably to support her claims. One in particular is the confinement in the institution for defectives, which seems to have been a most unwarranted and callous thing to do. Of course, it does not directly relate to the question of whether or not the husband tried to effect a reconciliation, but it throws much light on the relations of the parties, and clearly evidences an intention or desire on the husband's part to be rid of his wife, and to subject her to humiliation and disgrace.

The documentary evidence is of interest. *Exhibit D-1* is a letter from Dr. Carstarphen to the defendant in which he reviews his status and that of the family; states that his

practice is completely gone; that he could get an institutional position if he were single; he says "my proposal therefore, and it is honest—sincere and with Christian sympathy to all concerned—as the best solution to a now impossible one—is that we get a divorce." He emphasizes strongly the desirability of a divorce in order that he may rehabilitate himself, but fails to point out just what his meaning was or how a divorce could help him in the situation he outlined. This was under date of May 26th, 1932, and contained not a single word about reconciliation. *Exhibit D-5* is an undated letter to the wife containing news of the children and contains a postscript "This letter is purely information—with no intent or desire to begin a discussion." Apparently he feared the letter might be interpreted as a gesture toward reconciliation, so he clarified it in no uncertain terms. Then on March 10th, 1934, he wrote dwelling at length on his troubles both physical and financial, but no friendly offers were made. The tone of the whole letter is hostile. *Exhibit D-12* is the wife's reply under date of March 15th, 1934, couched in most friendly terms and asking that the parties get together and talk things over. She offers to return and nurse and work for him, no matter what his financial circumstances may be.

This petitioner is unable to produce one written word to support his contention that he made overtures to his wife for a return. He relies on his own testimony and that of the two of his children who evidenced and to some extent admitted on the witness stand a hostile attitude toward their mother.

Not only has the petitioner failed to prove a case of obstinate and willful desertion, but he has utterly failed to show the required attempts at reconciliation on his part. It follows, therefore, that he cannot have a decree for divorce and such decree must be reversed.

As to the wife's counter-claim for maintenance, here, too, she is entitled to prevail. Her story of the events leading up to the separation is more believable than his. The testimony showed not only that she was justified in leaving petitioner's home in the circumstances, but that in fact she was deliberately driven therefrom. The petitioner complains that her

false accusations and gossip ruined his medical practice, but there is no proof of that beyond his uncorroborated testimony. In *Exhibit D-1,* written in May, 1932, he says, "should business ever pick up here, *i. e.,* in private practice, the same stigma is attached to me here or wherever I may go—it is a handicap that no matter how hard I try it is impossible to overcome." This was when he was blaming her for the separation and asking a divorce. But later, in March, 1934, he wrote in explaining his connection with some corporation "this I know will surprise you—when I tell you that my reputation both here in Plainfield, and in Newark and New York is excellent—That however at this crisis does not get me any work." So, little credence can be put on his claim that she ruined him professionally.

A reading of the testimony leads one to conclude that the wife had cause for leaving her husband. There were many small things, such as refusing to eat at home and going to a restaurant, telling her to get out, &c., which incline one to her version of the domestic situation. But regardless of that, it is established that she has evidenced a willingness to return and that it is his obstinacy that has kept them apart. In this situation, it was error to dismiss her counter-claim for separate maintenance.

The decree under review is reversed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Trenchard, Parker, Lloyd, Case, Bodine, Donges, Heher, Perskie, Dear, Wells, Wolfskeil, Rafferty, Cole, JJ. 14.